Argued and submitted November 10, 2003, award of parenting time to petitioner
reversed; otherwise affirmed August 4, 2004

In the Matter of the Marriage of

David Patrick VAN DRIESCHE,
*Respondent,*
*and*

Melissa Dawn VAN DRIESCHE,
*Appellant.*

15-01-17092; A118214

95 P3d 262

James A. Palmer argued the cause and filed the brief for
appellant.

John Svoboda argued the cause and filed the brief for
respondent.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

In the context of a marital dissolution proceeding, the trial court awarded stepfather, petitioner below, substantial parenting time with child over mother's objection. Mother appeals, contending that the trial court erred in determining under ORS 109.119 that stepfather rebutted the presumption that the legal parent acts in the best interest of the child. We agree with mother and reverse.

On *de novo* review, ORS 19.415(3) (2001),[1] we find the following facts. Child was born in June 1998, one month after mother had moved in with stepfather. Mother and stepfather were married four months later. From child's birth, stepfather assumed a parental role. Shortly after the marriage, mother consulted an attorney regarding stepfather's possible adoption of child, but the parties decided against an adoption because of the expense and because of mother's concerns about having to contact child's biological father.

For the first two years of child's life, mother stayed at home to care for child and stepfather worked full time as a pharmacist. The three lived as a family unit, with stepfather assisting with parental duties when he was at home. The parties agree that mother was child's primary caregiver. When child was about a year old, arguments between the parties increased in frequency and intensity, and the parties

---

[1] The legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply only to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered on or after the effective date of this 2003 Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this 2003 Act."). The judgment in this case was entered on May 2, 2003. Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3). *But see Kunze and Kunze*, 337 Or 122, 124, 92 P3d 100 (2004) (apparently citing the current version of ORS 19.415(3) in addressing a judgment that was entered before January 1, 2004).

entered marriage counseling. The source of some of the arguments, according to mother, was that stepfather was becoming less involved with child and mother and spending increasing amounts of his at-home time on the computer. Stepfather's jealousy and controlling behavior also were a frequent subject of contention, although mother testified that she was not behaving in a manner that warranted jealousy. Mother claims that stepfather initiated the arguments "almost all of the time."

Mother estimates that fights occurred once or twice a month while she and stepfather were living together. There was frequent yelling and use of profanity, and stepfather called mother extremely derogatory names. During one argument, stepfather called mother's parents to ask them to pick her up because he was "going to kill her." The arguments took place in front of child "sometimes" according to stepfather and "often" according to mother.

The arguments became increasingly physical. On one occasion, mother slapped stepfather, and he slapped her. On another occasion, stepfather pushed mother twice; mother was holding child the second time and the push caused their heads to knock together, seriously upsetting child. Mother called the police on that occasion and stepfather was arrested, but no charges were filed after the couple's marriage counselor advised mother that pressing charges would interfere with counseling efforts. Stepfather prevented mother from leaving the house during arguments by taking her car keys away; on at least one occasion, he ripped a phone out of the wall to prevent her from calling her parents to retrieve her.

In June 2000, when child was two years old, mother and child moved to Salem while stepfather remained in Eugene. The move was partly an opportunity for mother to attend a vocational training program near her sister, who could provide child care, and partly was viewed by the parties as a separation. Over the next year (the visitation year), stepfather visited with child approximately two out of every three weekends. Stepfather contends that he continued in the role of child's father during the visitation year. Mother and stepfather discussed making continued visits between stepfather

and child conditional on stepfather attending anger management counseling, although stepfather denies that the parties actually agreed to such a condition. In any event, stepfather did not seek counseling. Stepfather financially supported mother and child after they moved to Salem.

During the visitation year, mother sent stepfather several cards and e-mails in which she referred to stepfather as child's "daddy." In March 2001, stepfather sent mother an e-mail asking, "So you won't ever have anyone else adopt [child]? I will always be his dad?" Mother responded, "yesssssssssssssss!!!!!!!" However, mother testified to frequent ambivalence about stepfather's role in child's life during the visitation year. She began to see cycles in stepfather's behavior, noting that he would be kind and friendly at times, particularly in front of other people, and then would turn angry and violent when they were alone. Mother testified that, during the visitation year, stepfather attempted to control her by contacting her mother for information regarding mother's personal life, though stepfather testified that he did not remember doing so. Mother also felt financially vulnerable and claims that stepfather "continually" threatened to take away the van that served as her only source of transportation unless she allowed him to see child. She believed that he would cut off financial support if she did not allow visits. The parties' relationship deteriorated further during the visitation year and, during one argument, stepfather grabbed a curling iron out of mother's hand and broke it on the counter. Mother claims that stepfather hit her with the curling iron, though he denies doing so.

After an argument in August 2001, when child was three years old, mother informed stepfather that she did not want him to have contact with child any longer. The following month stepfather filed for divorce and petitioned for visitation rights with child. Stepfather apparently had three visits with child between August 2001 and the dissolution hearing in March 2002, although one of those occurred at mother's parents' invitation without mother's knowledge or consent.

Although the record contains no evidence that stepfather was inappropriately angry with child, there is evidence that child was present for some of the parties' arguments, and mother expressed fears that stepfather would

"take his anger out on [child]" as child grew older and that stepfather would call mother derogatory names when speaking to child outside of mother's presence. Mother also expressed concern that visits with stepfather would interfere with her relationship with child.

As of the time of the dissolution hearing, child, then nearly four years old, referred to stepfather as "daddy" and asked about him, though "not constantly." Stepfather testified to his personal belief that child would suffer "in some way" if denied contact with him because child would miss him, because he has been "a good influence on [child]," and because "we have fun together." Mother disputed that lack of contact with stepfather would be detrimental to child. Stepfather expressed no criticism of mother as a parent.

The trial court concluded that stepfather had a "child-parent relationship" with child, as defined by ORS 109.119, and that stepfather had rebutted by a preponderance of the evidence that statute's presumption that mother, as child's legal parent, acted in the best interests of child in limiting visitation. The trial court cited, without elaboration, several statutory factors as its required "findings" supporting rebuttal of the statutory presumption: (1) "there are circumstances which are detrimental to the child which exist if parenting time is not granted"; (2) mother "has in fact fostered and encouraged and consented to the establishment of the relationship" between child and stepfather; (3) the "granting of * * * parenting time * * * will not substantially interfere with the custodial relationship" of child and mother; and (4) mother "has unreasonably denied or limited contact" between child and stepfather. *See* ORS 109.119(4)(a)(B) - (E). The trial court also found that "it is in the best interest of [child] that [stepfather] be granted parenting time." Stepfather was awarded visitation two out of every three weekends and half of all holidays.

Mother contends that the trial court erred in concluding that stepfather rebutted the statutory presumption in favor of the legal parent's visitation preferences. Mother offers several reasons why the presumption was not rebutted: (1) stepfather did not have a substantial relationship with child; (2) stepfather behaved inappropriately toward

mother in front of child; and (3) stepfather failed to demonstrate that loss of contact would have a negative effect on child. Stepfather responds that "[n]o expert opinion is necessary to support what common knowledge and experience tells us": that loss of contact would be "detrimental to * * * child's well-being and sense of security" because stepfather is the only father child has ever known. In addition, stepfather notes that the father-child relationship was encouraged and supported by mother for the first three years of child's life, until mother suddenly cut off contact in August 2001. We agree with mother that the presumption in her favor has not been rebutted, although for slightly different reasons than she articulates.

██   Our inquiry is governed by ORS 109.119. That statute was amended in 2001 in response to the United States Supreme Court's decision in *Troxel v. Granville,* 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), which "requires a court, in making custody or visitation decisions, to accord some special weight to a parent's determination of what is in the child's best interest." *O'Donnell-Lamont and Lamont,* 337 Or 86, 106, 91 P3d 721 (2004). The 2001 amendments to ORS 109.119 added a rebuttable presumption in favor of legal parents as against third parties with regard to custody, guardianship, visitation, and other rights. *See* ORS 109.119(1) - (3); *Wurtele v. Blevins,* 192 Or App 131, 143-44, 84 P3d 225 (2004). The amendments also added two lists of nonexclusive factors that a court "may" consider in deciding whether the presumption has been rebutted and whether to award custody, *see* ORS 109.119(4)(b), or visitation, *see* ORS 109.119(4)(a), to a nonparent.

The relevant portions of ORS 109.119 are as follows. First, subsection (1) sets forth the conditions under which a nonparent may obtain relief:

"[A]ny person, including * * * a * * * stepparent, * * * who has established emotional ties creating a *child-parent relationship* or an *ongoing personal relationship* with a child may petition * * * for relief under subsection (3) of this section."

(Emphasis added.) Subsection (3) provides that the court may grant, among other things, a right of visitation "if to do

so is in the best interest of the child," provided that the petitioning nonparent overcomes a presumption in favor of the legal parent as set forth in subsection (2):

"(a) In any proceeding under this section, there is a presumption that the legal parent acts in the best interest of the child.

"(b) In an order granting relief under this section, the court shall include findings of fact supporting the rebuttal of the presumption described in paragraph (a) of this subsection."[2]

If the court determines that the nonparent has established the existence of a "child-parent relationship," the statutory presumption may be rebutted by a preponderance of the evidence. ORS 109.119(3)(a). If the court determines that the nonparent has established only an "ongoing personal relationship," the statutory presumption must be rebutted by clear and convincing evidence. ORS 109.119(3)(b).

Our first task under the statute, then, would be to determine whether stepfather has a "child-parent relationship" or an "ongoing personal relationship" with child. That determination establishes whether stepfather must rebut the statutory presumption in favor of mother by a preponderance of the evidence or by clear and convincing evidence. *See* ORS 109.119(3). The trial court concluded that stepfather and child had a "child-parent relationship" and that stepfather had rebutted the presumption by a preponderance of the evidence. However, we need not resolve the preliminary

---

[2] The trial court in this case merely recited the statutory factors without explaining how those factors, as applied to these facts, support its determination that the presumption in favor of mother has been rebutted. Trial courts should provide such explanation in order to facilitate appellate review. *Cf. Roppe and Roppe*, 186 Or App 632, 635 n 3, 64 P3d 1145 (2003) (addressing the need for findings beyond recitation of the statutory factors in the context of spousal support order); *Schoch v. Luepold & Stevens*, 162 Or App 242, 250, 987 P2d 13 (1999) (addressing the need for such findings in the context of attorney fee awards). Nevertheless, remand to the trial court is not necessary in this case because the record is fully developed and because, even if we were to assume that the factual matters that are dependent on credibility were resolved in stepfather's favor, stepfather still failed to rebut the statutory presumption by a preponderance of the evidence. Consequently, a remand for findings by the trial court would not affect our review and would needlessly delay final disposition of this appeal.

question of the nature of stepfather's relationship with child because, as we will explain, we determine that stepfather failed to rebut the presumption even under the lower burden of proof.

Accordingly, we address whether stepfather rebutted, by a preponderance of the evidence, the presumption in ORS 109.119(2)(a) that mother acted in the best interests of child in denying stepfather visitation with child. ORS 109.119(4)(a) provides that we "may" consider the following five factors in making that determination:

"(A)   The petitioner * * * is or recently has been the child's primary caretaker;

"(B)   Circumstances detrimental to the child exist if relief is denied;

"(C)   The legal parent has fostered, encouraged or consented to the relationship between the child and the petitioner * * *;

"(D)   Granting relief would not substantially interfere with the custodial relationship; or

"(E)   The legal parent has unreasonably denied or limited contact between the child and the petitioner * * *."[3]

We begin by considering whether "circumstances detrimental to the child exist" if stepfather is denied visitation.[4] See ORS 109.119(4)(a)(B). According to the statute, such circumstances "include[ ] but [are] not limited to circumstances that may cause psychological, emotional or physical harm to a child." ORS 109.119(8)(b). As the Supreme Court reasoned in O'Donnell-Lamont, "the nonparent must

---

[3] With regard to the nonexclusive list of factors used to determine whether a nonparent has rebutted the presumption and whether to award custody to the nonparent, see ORS 109.119(4)(b), the court in O'Donnell-Lamont reasoned that the weight that each factor carries will vary depending on the circumstances of each case. O'Donnell-Lamont, 337 Or at 109. Ultimately, "the focus of the statute here is not on whether one or more of the statutory factors are present but on whether the evidence as a whole is sufficient to overcome the presumption that the parent acts in the best interest of the child." Id. The Supreme Court's reasoning applies to this case, which involves a similar list of nonexclusive statutory factors.

[4] Stepfather does not contend that he is or has been child's "primary caretaker" within the meaning of ORS 109.119(4)(a)(A).

demonstrate that the circumstances of living with the legal parent pose a serious *present* risk of psychological, emotional, or physical harm to the child."[5] 337 Or at 113 (emphasis added).

Stepfather contends that emotional harm is inevitable when a child is separated from the only father the child has ever known. However, stepfather presented no expert testimony to support his view. He likewise presented no testimony demonstrating that child suffered after having only three visits with stepfather between August 2001 and the dissolution hearing in March 2002. Mother testified that child asks about stepfather, but "[n]ot constantly. Not on a daily basis." Stepfather's only evidence was speculation that child would suffer "in some way" if he had no contact with child, "[i]n part" because child would miss him, because he has been "a good influence" on child, and because "we have fun together." Stepfather has failed to show any "serious present risk" to child from lack of visitation; his speculation as to future, *possible* harm is insufficient to overcome the presumption in favor of mother.

Stepfather also asserts that "[g]ranting relief would not substantially interfere with the custodial relationship." *See* ORS 109.119(4)(a)(D). Stepfather was granted visitation on two-thirds of all weekends and half of all holidays. This will require a significant amount of coordination and contact between the parties. It is stepfather's burden to show that visitation will not substantially interfere with the mother-child relationship, and we find little evidence in the record to support stepfather's view.

Stepfather also asserts that mother "unreasonably denied or limited contact between" child and stepfather. *See* ORS 109.119(4)(a)(E). Her ultimate denial of contact in August 2001 appears reasonable in light of the acrimonious nature of the parties' relationship and child's exposure to that hostility. The fact that the most egregious events took

---

[5] The Supreme Court interpreted ORS 109.119(4)(b)(C), which is a factor that the court may consider in a *custody* case and provides that "[c]ircumstances detrimental to the child exist if relief is denied." Because the text of that factor is identical to the text of the factor at issue here, *see* ORS 109.119(4)(a)(B), we apply the Supreme Court's interpretation.

place some months before mother's decision to cut off contact should not operate against mother. She is allowed to reevaluate her past choices, particularly where the arguments continued and stepfather declined to seek counseling.

Stepfather's best argument is that mother "fostered, encouraged or consented to the relationship" between child and stepfather for the first three years of child's life. *See* ORS 109.119(4)(a)(C). In *O'Donnell-Lamont*, the court held that a parent's encouragement of such contact can suggest that "at least at one point, [the parent] apparently believed that that relationship was beneficial, or at least not detrimental, to the child." 337 Or at 115. Mother certainly encouraged the relationship during the two years that the couple was living together. During the visitation year, mother encouraged the relationship with cards and e-mails, although she contends that she was ambivalent about contact and acted largely out of fear because of her financial vulnerability. *O'Donnell-Lamont* indicates that, under the particular circumstances of a given case, that factor may be given little weight where the parent agreed to nonparent contact because, under the circumstances and at the time, the contact was in the best interests of the child. *Id.* at 115-16. For the first two years of child's life, encouraging stepfather's relationship with child would have been in child's best interest. Despite the couple's problems, the relationship arguably was salvageable, and both mother and stepfather willingly entered marriage counseling. Continued contact during the visitation year was less obviously in child's interest.

In conclusion, the only factor in favor of stepfather is that mother encouraged his relationship with child, at least for a time. Viewing the evidence as a whole, with due regard for stepfather's behavior toward mother and the lack of evidence of any detriment to child in the absence of visits with stepfather, he has not satisfied his burden to rebut the statutory presumption in favor of mother.

Award of parenting time to petitioner reversed; otherwise affirmed.